**Fred T. DURROUGH, Appellant,**

**v.**

**STATE of Texas, Appellee.**

**No. 13-83-010-CR.**

Court of Appeals of Texas, Corpus Christi.

May 24, 1984.

Chrysanthe A. Lambros, Lambros, Clay & Justice, San Antonio, for appellant.

Ed Shaughnessy, III, Appellate Div., San Antonio, for appellee.

Before NYE, C.J., and GONZALEZ, and KENNEDY, JJ.

OPINION

GONZALEZ, Justice.

This is an appeal in a murder case. The jury assessed punishment at life imprisonment. On appeal, appellant asserts that the trial court erred in admitting evidence of an allegedly tainted identification, in failing to dismiss the indictment based upon the loss by the State of some defense exhibits, in admitting an extraneous "offense," and in submitting a supplemental jury charge after the jury had retired to deliberate. Appellant also alleges that the evidence was insufficient to corroborate the accomplice testimony. We affirm.

Appellant has been indicted five times, tried four times, and found guilty three times of the murder of Henry S. Tyler. The offense occurred in San Antonio in August, 1973.

The first trial, Cause No. 74-CR-575-A, was aborted when the trial court granted the State's motion to dismiss the indictment after five jurors had been selected. Appellant was reindicted and found guilty of the offense of capital murder in Cause No. 74-CR-2140-A, but that judgment was reversed on appeal because the trial court erred in failing to grant a change of venue upon appellant's uncontroverted application. *Durrough v. State,* 562 S.W.2d 488 (Tex.Cr.App.1978). After the case was remanded, but before the trial which resulted in the second conviction began, the State moved to dismiss the then pending indictment because it was "faulty." A third indictment was obtained, and the appellant was found guilty and sentenced to death a second time. He appealed, and the judgment (Cause No. 79-CR-78) was reversed on the basis that the trial court erred in excluding a prospective juror that had conscientious scruples against capital punishment, and acknowledged that the mandatory penalty of death or life imprisonment might affect her deliberations, but who stated that she could answer the questions put to her based on the evidence. *Durrough v. State,* 620 S.W.2d 134 (Tex.Crim.App.1981).

The case now before us is an appeal of appellant's conviction in Cause No. 82-CR-418-D, a trial conducted in Nueces County on change of venue from Bexar County.

The following is an abbreviated chronology of events:

August 11, 1973 Date of offense

October 3, 4, 1973 Accomplices arrested, and statements taken in which appellant was implicated.

December 20, 1973 Appellant's Examining Trial

September 18, 1974 Hearing on motion to suppress pretrial and in-court identification in Cause No. 74-CR-575-A.

March 12, 1982 Hearing on motion to suppress pretrial identification.

June 14, 1982 Stipulation filed that prior testimony of Mrs. Dorothy Tyler given in trials in Causes 74-CR-2140A (first conviction) and 79-CR-78 (second conviction) and at the examining trial of December 20, 1973, may be read into evidence without further predicate. This is because at the time of this last trial which resulted in the instant appeal, Mrs. Tyler was deceased.

June 14, 1982 Jury sworn, trial commenced.

June 21, 22, 1982 Appellant found guilty of murder and sentenced to life.

Viewing the evidence in the light most favorable to the verdict, the record shows that three men, appellant, and Jimmy and Bobby Gifford, went to the Tyler home with the intent to commit a burglary or a robbery. After Mr. Tyler answered the doorbell, his wife heard a shot. She rushed to the front porch and found Mr. Tyler bleeding from a bullet wound. As Mrs. Tyler was pushed back into the entrance of her home by Jimmy Gifford, she saw appellant shoot her husband a second time. The trio fled, but not before appellant turned at the curb and shot Mr. Tyler a third time.

At trial, and on appeal, the key issue is whether Mrs. Tyler's identification testimony was admissible.

Since Mrs. Tyler was deceased at the time of appellant's last trial (the conviction from which this appeal stems), the State relied upon her testimony elicited at prior prosecutions of appellant, and upon part of the testimony she gave at the examining trial. The State also relied upon the live testimony of Bobby Gifford to show that appellant was the person who shot Mr. Tyler.

On appeal, appellant argues that the identification of appellant by Mrs. Tyler was the result of a pre-trial confrontation so suggestive that her in-court identification of appellant could not have been of an independent origin, and was therefore so tainted as to be rendered inadmissible. Appellant then argues that because her testimony was the only source of evidence to corroborate the testimony of Bobby Gifford, his conviction must be reversed, as the uncorroborated testimony of an accomplice is insufficient to support his conviction.

Specifically, appellant alleges in his first ground of error that:

> "The honorable trial court erred in admitting into evidence over appellant's timely objection, the tainted in-court identification testimony of Mrs. Dorothy Tyler, which was not of independent origin."

The State asserts that appellant's first ground of error was not properly preserved for review, arguing that in order to complain of a tainted in-court identification, the accused must lodge a timely and specific objection. *See Deary v. State,* 510 S.W.2d 956, 957-58 (Tex.Crim.App.1974).

Appellant counters that no objection at trial was necessary because a pre-trial hearing was conducted, and appellant's motion to suppress Mrs. Tyler's identification testimony was overruled. When such a motion is heard and overruled, another objection before the jury is not required to preserve error. *Waller v. State,* 581 S.W.2d 483, 485 and 485 n. 1 (Tex.Crim.App.1979).

The pre-trial hearing to which appellant refers was conducted on September 18, 1974, in Cause No. 74-CR-575-A in conjunction with appellant's first trial. Appellant states that the examining trial and suppression hearing testimony of Mrs. Tyler and Police Chief Stewart was "offered into evidence and incorporated into the record by reference, on the basis of which Appellant's Motion to Suppress was overruled by the Trial Court." [1]

1. Following submission of this case, appellant filed a "Motion to Include Omitted Exhibits of Appellant." These "omitted exhibits" are the court reporter's transcription of the examining trial (Exhibit "R") and of the hearing on the motion to suppress the identification made by Mrs. Tyler (Exhibit "Q"). We granted appellant's motion, but we received no supplemental record or any other modification from *the trial court. See* TEX.CODE CRIM.PROC.ANN. art.

A detailed review of the facts is necessary in order to properly evaluate appellant's contention. The offense occurred on August 11, 1973. After the confrontation on the front porch of the Tyler home, the assailants fled. After appellant was "implicated" by the Gifford brothers, he was arrested in Dallas on August 26, 1973.

Our examination of the record, as properly delivered to this Court by the District Clerk, and excluding the material we received from appellant's attorney in the form of "omitted exhibits," leaves no reasonable conclusion but that a motion to suppress Mrs. Tyler's pre-trial identification and in-court identification was filed and that this motion was overruled.[2] Therefore, appellant's objection to Mrs. Tyler's identification testimony was properly preserved for review.

Before the police became privy to the identity of the suspects through the aid of their informer, they attempted to establish a description from the recollections of Mrs. Tyler. Soon after the shooting, Officer Stewart and Texas Ranger Carpenter went to her home. This interview occurred in the interim between the murder and Mr. Tyler's funeral. At this time, she was not shown any photos; however, she did construct a composite of the person, later identified as Jimmy Gifford, who shoved her back inside her home as the other two assailants struggled with her husband. (Mrs. Tyler testified that she was not asked to make a composite of appellant.)

Stewart testified at trial that in response to a telephone call on or about October 2, 1973, he arrested Jimmy Ray Gifford. Jimmy Gifford gave a statement on October 4, 1973, and called his brother, Bobby. Bobby Gifford came to the Olmos Park Police Department and also gave a statement. Both brothers implicated appellant in the murder.

As another part of their efforts to ascertain the identity of the assailants, the authorities also showed photographs to Mrs. Tyler. Mrs. Tyler testified that she looked at photographs, both before and after the men were apprehended, on four to six occasions.

Concerning appellant, the results of these photo show-ups were inconclusive. The scenario was basically as follows: Carpenter and Stewart would lay down eight to ten photos, then ask Mrs. Tyler if she recognized anyone. Mrs. Tyler picked out a picture and said, "This is the man that shoved me." She also picked out another picture and said, "This is the man who pushed Colonel Tyler back against the wall." But Mrs. Tyler never picked a photo and categorically stated that it was a picture of the gunman. She would only go so far as to say that two or three "looked

40.09 Sec. 7 (Vernon Supp.1984). We did not sua sponte order the trial court to act on appellant's motion because the presiding judge of appellant's trial is now on the appellate bench. We did not consider it very practical for another judge to read through the voluminous records and make a ruling on appellant's motion. We did receive exhibits "Q" and "R" directly from appellant's attorney.

**2.** The hearing on appellant's pre-trial motions held on March 12, 1982, reflects the following:

THE COURT: Do you want a hearing on your Motion to Suppress pre-trial identification again?

MR. ROTHE (Defense Attorney): I thought, what I thought we would do on that, Judge, I don't think the Court has heard any testimony since that hearing that we changed its mind about your ruling, so what we would do is offer again for the record, and have it file marked again. The exhibit, I think it was numbered or designated exhibit R. We'll offer it.

THE COURT: Okay. I'll give the same ruling.

MR. RYMAN (Prosecutor): And that's number—

MR. HRNCIR (Defense Attorney): Eighteen.

THE COURT: Eighteen and nineteen is identification hearing out of the presence of the jury. You have already had that.

MR. ROTHE: Yes, sir. We have.

THE COURT: That was granted. And this is denied.

MR. ROTHE: Just for the record on that motion number eighteen, I believe it was on the Motion to Suppress the in Court identification. To make it a little bit clearer we'll offer everything we offered the last time when you reviewed that in support of the motion.

MR. HRNCIR: I understand that was denied.

familiar." In her words, "I wasn't going to have anybody get in trouble with my mistaking a hazy photograph." Mrs. Tyler testified that she never marked any of the photos with her name or a date, and that she was never told any was a suspect, or that she had picked anyone related to the case.

As it later developed, one photographic spread of nine pictures contained two pictures of appellant, one with a mustache, one without. As indicated above, Mrs. Tyler failed to make a positive identification. Notwithstanding the lack of certainty on the part of Mrs. Tyler, the police were apparently convinced they had their man, for no line-up was conducted, and Mrs. Tyler was told the names of the suspects as each was arrested. Charges were filed against appellant, and after his arrest, he requested an examining trial.

The events that transpired at, and immediately preceding, this examining trial are brought forward by appellant to substantiate his claims that the identification testimony of Mrs. Tyler should have been excluded because it was tainted by the suggestive one-on-one confrontation at the courthouse, and not of independent origin. Appellant's counsel argues in her brief:

> It was at Fred T. Durrough's examining trial that Mrs. Tyler appeared on December 20, 1973 to give testimony. Mentally armed with the pre-suggested assumption of Appellant's identity and guilt as previously communicated to her by law enforcement officers, Mrs. Tyler awaited the commencement of the examining trial outside the courtroom, where she stood at a snack bar drinking coffee with her daughter, Ranger Carpenter, and police Chief Stewart. Suddenly, Appellant was brought into the same central corridor of the courthouse where Mrs. Tyler was standing. Appellant was was [sic] dressed in prison whites, was escorted on either side by armed deputies to whom he was handcuffed, and was surrounded by a swarm of press photographers and news cameramen, who focused extremely intense television lights on Appellant. In contrast to the normal lighting conditions in the hallway, the camera lights which were trained on Appellant caused him to [be] brightly spotlighted. It was while Appellant was in this condition that he was led within full view and twenty feet of Mrs. Tyler into the courtroom where Mrs. Tyler knew the examining trial of Appellant was to be held. No other prisoners were with Appellant, nor were any others brought into the courtroom.
>
> It was precisely at this time, when confronted by Appellant under such emotionally charged and highly suggestive circumstances, that Mrs. Tyler turned to her daughter, grabbed her arm and exclaimed, 'That's the man who shot Daddy,' or words to this effect. These were the first words of recognition ever uttered by Mrs. Tyler regarding Fred Durrough. At no time prior to this incident had Mrs. Tyler ever been able to describe Fred Durrough from memory, identify him from photographs, or pick him out as her husband's assailant.

Appellant argues: "It is this diametrical and cataclismic [sic] change in memory which should and, indeed must, lead reasonable observers to question whether Dorothy Tyler's identification of Appellant was based upon prior recollection or, rather, upon her startling view of him in the Bexar County Courthouse." Assuming the latter proposition, appellant complains that the courthouse confrontation was so impermissibly suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process.

At trial, there was both in-court and out-of-court identification testimony. Not only was the prior testimony of Mrs. Tyler read, wherein she identified appellant as the killer of her husband, but also Police Chief Stewart and Courtney Tyler Tanner (the Tylers' daughter) bolstered this testimony by repeating to the jury the exclamation of Mrs. Tyler ("That's the man who shot daddy") when she first saw appellant.

THE OUT-OF-COURT IDENTIFICATION

█ At the outset, we characterize the meeting between Mrs. Tyler and appellant as a one-on-one confrontation. Whether these confrontations occur at a police station or the courthouse or elsewhere, they are generally condemned, and should be avoided unless there are exceptional circumstances. *See Jackson v. State,* 657 S.W.2d 123, 129 (Tex.Crim.App.1983).

█ In this case, the record does not reflect any exceptional circumstances, and there is no excuse whatsoever to condone the State's conduct. Here, the unreasonable delay in the release of a possibly innocent man, or the need for a quickly continued search is not a factor. Appellant had been incarcerated for almost four (4) months—ample time for a competent police department in a major metropolitan area to assemble enough persons with similar traits to conduct a proper lineup.

█ In passing upon the admissibility of the out-of-court identification, we shall consider the factors to be weighed against the corrupting effect of a suggestive identification procedure in assessing reliability as set out in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and interpreted by the Court of Criminal Appeals in *Jackson v. State,* 657 S.W.2d at 129–30. These factors are:

(1) opportunity to view

(2) degree of attention

(3) accuracy of the description

(4) witness' level of certainty and

(5) time between alleged crime and confrontation.

█ Each case must be considered on its own facts to determine the likelihood that a particular pre-trial confrontation resulted in irreparable misidentification. The test is to determine from a totality of the circumstances whether there has been a deprivation of due process. *Jackson,* 657 S.W.2d at 127.

* * * OPPORTUNITY TO VIEW * * *

Mrs. Tyler testified that her porch was only ten feet wide. She stated she could see, and that there was nothing wrong with her vision. She described how at one point the appellant "bashed" the gun in her face. In a novel attempt to discredit her testimony, appellant argues not that the gunman was too far away for her to see him, but rather that the gunman was too close.

Appellant seeks to *limit* the distance that Mrs. Tyler saw the gunman to two feet, then argues that because Mrs. Tyler was farsighted, and because her glasses had been knocked off, she could not have seen clearly at this distance. This argument finds no support in the record. Mrs. Tyler's testimony was that the gunman never got any closer than two feet. Furthermore, Mrs. Tyler had been reading the newspaper while watching the television, and went to the porch with her glasses on.

Appellant also argues the lighting conditions were poor. The offense occurred at approximately 7:30 p.m. Mrs. Tyler's testimony was that "It was broad open daylight. During August it stays light a long time all during the summer."

Appellant makes much of statements elicited upon cross-examination that Mrs. Tyler's attention was focused on her husband, and not on looking at the assailants. Suffice to say that elsewhere in the record she stated, "I saw Durrough with a gun." And concerning the assailant she made the composite of, "I was eyeball to eyeball with him, about twelve inches."

Finally, appellant stresses the "repeated admissions" that Mrs. Tyler did not see the gunman's face because he wore a billed cap pulled low on his face. In *Garza v. State,* 633 S.W.2d 508, 513 (Tex.Crim.App.1982), the court held that the inability of a witness to view the facial features of a defendant was a matter affecting the weight to be given the evidence, not its admissibility.

We conclude the witness had an excellent opportunity to view the gunman.

* * * DEGREE OF ATTENTION * * *

Although many would agree with Mrs. Tyler that: "If you stand someplace and let somebody waive a gun in your face you are going to get a photographic memory, a picture of them and that's all there is to it," we find other indicia of her attentiveness. In describing the hat the gunman wore, she remembered it was beige, with a small circular emblem on it. Referring to Jimmy Gifford, she described him as taller than the others, slightly built, with blond hair, and two teeth missing. She described Bobby Gifford as a sixteen-year-old and having "eyes that were cruel, and mean as a cat." Furthermore, Mrs. Tyler had a ready recollection of the sequence of events. She remembered specific details, the time frame of events, and the positions of the parties.

It is obvious that Mrs. Tyler paid an adequate degree of attention to all the assailants, including the gunman.

* * * ACCURACY OF THE DESCRIPTION * * *

Because the attackers made good their escape, Mrs. Tyler's description of their clothing is of little value, other than to reinforce our conclusion concerning her attentiveness, for no comparison was possible between what she said they wore and what they actually wore that day. However, Mrs. Tyler also described the physical characteristics of the gunman. She stated he was "short, five six or seven," that "he had a curly look about his mouth," and that "his ears were set high on his head." No claim has been made that the appellant did not possess the physical characteristics as described.

* * * WITNESS' LEVEL OF CERTAINTY * * *

Mrs. Tyler was asked if she would ever forget appellant's face. Her response was: "Never. Never." She also testified she had an overall picture of appellant imprinted in her mind. Her certainty, coupled with her understanding of the responsibility involved, as indicated by her reluctance to make any accusations based on a "hazy" photograph, was unshakable.

* * * PASSAGE OF TIME * * *

The final factor is the time between the alleged crime and the confrontation. In this case, the murder occurred on August 11, 1973. Appellant was identified as the murderer at the examining trial on December 20, 1973.

Even disregarding Mrs. Tyler's assertions of a photographic memory of that experience, given Mrs. Tyler's age at the time (50's) and apparent good health, we do not believe that under these circumstances, four months is such a long period of time for memory to fade.

* * * CORRUPTING INFLUENCES * * *

Turning to the corrupting effect of the suggestive confrontation at the examining trial, appellant alleges he was viewed while dressed in jail whites, shackled to armed guards, and surrounded by the type of press retinue that is unique to capital murder prosecutions. *A review of the record fails to substantiate these allegations.*

Police Chief Stewart could not recall that appellant was in a white jail outfit, neither could he remember whether appellant was handcuffed. He stated he had no independent recollection of bright lights.

Courtney Tyler Tanner described appellant's dress on the day of the examining trial as a white shirt and a grayish green jacket. She also testified that appellant could only be seen from about mid-chest up because of a "crowd milling around" and that she could not see his hands.

Appellant repeatedly stresses that extremely bright lights were focused on him by the "swarm" of media representatives. We are not directed to any portion of the record or a bill of exceptions describing this "swarm," nor to appellant's dress or "shackles" for that matter. But as will be discussed in more detail in the second ground of error, both Mrs. Tyler and her daughter were adamant that the identifica-

tion by Mrs. Tyler was made *before* the camera lights illuminated appellant. What occurred *after* the identification would only be a factor affecting the weight to be given to Mrs. Tyler's testimony, not to its admissibility. *Cf. Jackson v. State,* 657 S.W.2d at 128.

We note that the examining trial was a judicial proceeding. Mrs. Tyler was the State's key witness, and the prosecution either knew or should have known that there had never been a positive identification, either by lineup or photo show up. Given these facts, in the interest of fairness to appellant and to protect the credibility of our legal system, the State should have taken precautions to insure that this type of confrontation not occur.

This notwithstanding, while the identification procedure was unnecessarily suggestive, we conclude, based on the totality of the circumstances, that there did not exist a substantial likelihood of misidentification. The due process clause of the fourteenth amendment does not compel the exclusion, apart from any consideration of reliability, of pre-trial identification evidence obtained by a police procedure that was both suggestive and unnecessary. *Jackson,* 657 S.W.2d 130. Reliability is the linchpin. *Id.* at 128. From the totality of the circumstances, we find the out-of-court identification was reliable and admissible.

## THE IN-COURT IDENTIFICATION

"[E]ven where the pre-trial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification." *Jackson,* 657 S.W.2d at 130.

The factors to be considered in determining the origin of an in-court identification include:

(1) the prior opportunity to observe the alleged criminal act;

(2) the existence of any discrepancy between any pre-lineup description and the defendant's actual description;

(3) any identification prior to lineup of another person;

(4) the identification by picture of the defendant prior to the lineup;

(5) failure to identify the defendant on a prior occasion; and

(6) the lapse of time between the alleged act and the lineup identification.

*Thompson v. State,* 480 S.W.2d 624, 627 (Tex.Crim.App.1972).

Applying the above criteria to the evidence, we hold that the in-court identification of appellant by Mrs. Tyler was of independent origin. We have previously noted her opportunity to observe the criminal act and the absence of any claim of a discrepancy between her description of appellant's physical attributes and his actual appearance. In the instant case, there was no evidence of any misidentification. In response to appellant's complaint that Mrs. Tyler never constructed a composite of the gunman, there is evidence in the record to show she was never asked to do so. Mrs. Tyler expressed confidence that she could have constructed a composite.

In his brief, appellant argues that *Proctor v. State,* 465 S.W.2d 759 (Tex.Crim.App. 1971) stands virtually "on all fours" and is dispositive of the appeal. We disagree.

The in-court identification in *Proctor* was held inadmissible because the court was unable to conclude there was clear and convincing proof that the identification was of independent origin. 465 S.W.2d at 765. The bulk of the opinion in *Proctor* is a statement of the facts. The court then applied the *Thompson* factors, and found that under a totality of the circumstances, the identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process. 465 S.W.2d at 765. With a test of this nature, we reject appellant's argument that one set of facts is dispositive of another. As we previously stated, each case must be decided on its own facts.

Generally, once the in-court identification of the accused is questioned as violative of due process, a hearing should be conducted. In that hearing, the burden is upon the prosecution to establish by clear and convincing proof that the testimony is not the fruit of an earlier identification violative of the *Wade* and *Gilbert* mandates or of due process. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). "By 'clear and convincing' is meant 'so clear as to leave no substantial doubt' and 'sufficiently strong to command the unhesitating assent of every reasonable mind.'" *Spencer v. State,* 466 S.W.2d 749, 752 (Tex.Crim.App.1971) (quoting *Martinez v. State,* 437 S.W.2d 842, 849 (Tex.Crim.App.1969)). "The initial decision as to the reliability of the identification procedure is and should be within the discretion of the trial court which has the unique opportunity to evaluate the witnesses and to get the feel of the case." 437 S.W.2d at 848. The standard of appellate review is abuse of discretion. *Spencer,* 466 S.W.2d at 753.

In the instant case, it would have been helpful had the trial court made findings of fact and conclusions of law as recommended in *Martinez,* 437 S.W.2d at 848–49. The failure to make written findings of fact is not reversible error, *Jackson,* 657 S.W.2d at 124 n. 1.

In *Jackson v. State,* 628 S.W.2d 446 (Tex. Crim.App.1982), the Court wrote:

> A defendant who contends on appeal that a trial court erred in allowing an in court identification of him by a complaining witness has a difficult and heavy burden to sustain, for unless it is shown by clear and convincing evidence that a complaining witness' in court identification of a defendant as the assailant was tainted by improper pre-trial identification procedures and confrontations, the in court identification is always admissible. Compare, *Proctor v. State,* 465 S.W.2d 759 (Tex.Cr.App.1971); *Coleman v. State,* 505 S.W.2d 878 (Tex.Cr.App. 1974), which cases were reversed by this Court because the evidence that went to the in-court identification caused a substantial likelihood of irreparable misidentification.
>
> The ultimate factor to be decided, where a complaining witness' in court identification is challenged, rests on how independent a witness' ability to reconstruct an accurate image of the criminal wrongdoer may be, in comparison with the appearance of the defendant in court.

628 S.W.2d at 448.

We hold that appellant has failed to show by clear and convincing evidence that Mrs. Tyler's in-court identification of appellant as the gunman was so tainted by improper pre-trial identification procedures that it was not of an independent origin. It was for the jury to decide whether her testimony was credible and the weight it would be given. *Garza v. State,* 633 S.W.2d 508, 514 (Tex.Crim.App.1982); *see also Jackson v. State,* 657 S.W.2d at 130. Appellant's first ground of error is overruled.[3]

## LOST EXHIBITS

In his second ground of error, appellant complains that the trial court erred in overruling his motion to dismiss the prosecution against him based upon the State's loss of defense exhibits.

Approximately two weeks prior to the trial (the one now on appeal), appellant's counsel was notified that except for two defense exhibits, all of the rest could not be located. Included among the lost exhibits was Exhibit "O," a picture of a single frame of a TV newsreel film that allegedly depicted the precise moment of the confrontation between appellant and Mrs. Tyler at the examining trial on December 20, 1973, immediately preceding her identifica-

3. While not dispositive of any issue, it is interesting to note that thirty-six jurors have been convinced, beyond a reasonable doubt, that appellant was guilty of the Tyler murder; twenty-four of which were sufficiently convinced to impose the death penalty.

tion of appellant at the examining trial. It is asserted by appellant that the original was a glossy color enlargement. Available at appellant's trial was a blurry photocopy in black and white.

Also lost was the photographic spread (mugshots) shown to Mrs. Tyler which contained two pictures of appellant and from which she had failed to identify appellant.

At the hearing on the motion to dismiss the prosecution based upon the State's loss of the defense exhibits, it was developed that an investigator for the Bexar County District Attorney's office checked out the exhibits after the first two trials and delivered them to the Bexar County District Attorney. The State did not offer an explanation as to why the exhibits were not returned to the Clerk's office.[4]

In addressing this ground of error, neither counsel has cited a single case that aids this Court in resolving the effects of this disturbing loss of evidence.

Appellant's analysis treats the matter as a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and progeny, stating that the standard for harmful error adopted by the Court of Criminal Appeals is:

> (1) Suppression or withholding by the prosecution after a request by the defense;
>
> (2) The evidence's favorable character for the defense; and
>
> (3) The materiality of the evidence.

*See Ridyolph v. State,* 503 S.W.2d 276, 278 (Tex.Crim.App.1974).

There is a fundamental distinction between the purpose of the *Brady* doctrine and the facts in this case. Here, there was no breach, either intentionally or negligently, of the prosecutor's constitutional duty to disclose evidence favorable to the accused. The defense was already well aware of the existence of these exhibits. Therefore, the *Brady* doctrine is not applicable to this case.

In our opinion, the primary issue in this ground of error is whether appellant was denied his constitutional right of confrontation when loss of the exhibits hindered impeachment of the identification testimony of Mrs. Tyler.

We first examine the loss of the original photograph depicting the confrontation before the examining trial. At trial, a copy of a copy was introduced. Appellant complains that this copy was not a satisfactory facsimile of the original, and argues:

> The original, on the other hand, was a glossy color photograph of greater clarity and far greater contrast, demonstrating in much more graphic detail the intensity of the camera lights which were focused on Fred Durrough as he was led in shackles and under guard through the Bexar County Courthouse hallway.... The photograph, had the jury seen the original, would have exemplified the suggestiveness and impact of the confrontation, which tainted Dorothy Tyler's in-court identification of Fred Durrough.

It appears that the original photo of the confrontation was introduced in the 1979 (second) trial of appellant. As counsel for defense tendered the photo to Mrs. Tyler, he stated it was "kind of blurry." Her reply was "very blurry." She was then cross-examined concerning the events depicted in the photo. We hold that appellant was not deprived of his opportunity to impeach Mrs. Tyler. Furthermore, *both* Mrs. Tyler and her daughter testified that the photo was made *after* Mrs. Tyler had made the out-of-court identification.

The loss of the mugshots presents a more difficult question. However, again, the primary issue is whether appellant was denied an opportunity to cross-examine the witness.

In *Wright v. State,* 491 S.W.2d 936, 939 (Tex.Crim.App.1973), the court wrote: "A defendant is entitled to a fair opportunity to cross-examine a State's witness. Such cross-examination must be done with due

4. Before appellant was ever placed on trial, the police lost the fingerprints taken from the Tyler's front porch and the slugs removed from the body of the deceased.

regard to rules of evidence and within the sound discretion of the trial court." In this case we cannot say that appellant was denied a fair opportunity to cross-examine Mrs. Tyler.

Our examination of the record strongly suggests that appellant did not attempt to bring up the matter of the photo lineup in the 1979 trial, when the witness was alive and the exhibits were apparently intact. Nonetheless, appellant in his brief argues:

> Had the photographic spread not been negligently lost by the State, the jury would have had the opportunity to see and compare the live appearance of the Appellant with the photographs. This opportunity was critical, in light of a conflict in the evidence regarding the quality of the photographs of Appellant. The testimony of Mrs. Tyler adduced at the 1979 trial reflected that the photographs of Fred Durrough were "unclear", whereas in prior testimony she had never complained of the picture quality.
>
> Although the jury knew that Dorothy Tyler had failed to identify Fred Durrough from a photo lineup containing two of his pictures, Mrs. Tyler excused this failure on the premise that the pictures were poor. Whether her failure to identify Appellant was really due to (1) bad pictures, or (2) a bad memory, was a matter that could only be resolved by the jury's having the opportunity to observe the actual photographs, determine their quality and compare their likeness to the accused. Appellant contends that the existence of these pictures might have had an effect on the out come of the trial, since identification of Appellant was the key defensive issue. Had the jury seen the photos and concluded that they represented a good likeness of the Appellant, the jury is likely to have questioned why Mrs. Tyler failed to identify the accused if, indeed, her memory for his identity was as good as the State claimed. Such comparative analysis by the jury was rendered impossible by the fact that the exhibits were lost completely and not even preserved in xeroxed form.

As a result of these exhibits being lost, the relief requested by appellant is that we reverse the conviction with instructions to dismiss the indictment, or in the alternative, that his conviction be reversed with instructions to suppress the identification testimony of Mrs. Tyler.

We note that the police showed Mrs. Tyler the photo spread in 1973. The trial which resulted in appellant's conviction now on appeal was in 1982. Viewing the evidence in the light most favorable to the verdict as we are required to do, the photos were unclear, as Mrs. Tyler testified. They would have been of very little or no assistance to the 1982 jury to compare the photos with appellant's physical appearance in 1982.

We have previously held that Mrs. Tyler's identification of appellant was of independent origin. From the record as a whole, we further conclude that appellant was not denied a fair trial. Appellant's second ground of error is overruled.

Notwithstanding the fact that we have overruled appellant's second ground of error, we pause to register our chagrin over the loss of these exhibits. The loss by the State of such exhibits (in no less than a capital murder case) is deplorable and inexcusable. While none of us are infallible, we should expect tighter security procedures from our public officials. How can we expect the public to have confidence in our judicial system, when those charged with the duty to safeguard the integrity of court records and attorney's act in such a lax manner? It is our hope that remedial steps have been taken to make it unlikely that something like this will happen again.

EXTRANEOUS OFFENSE

In his third ground of error, appellant complains that evidence of extraneous transactions was admitted despite timely objection. Appellant alleges that the State elicited testimony from four witnesses to show appellant's possession of a pistol and his carrying of such weapon in a concealed

fashion on premises licensed to serve liquor.

Appellant divides his argument into two parts. First, he argues that testimony from Bobby Gifford, Sam Odom, and Candy Gifford that appellant possessed a pistol prior to the murder offense should have been excluded as irrelevant.

Appellant objected to Candy Gifford's testimony on grounds of relevancy, as well as that the testimony was inadmissible evidence of an extraneous offense. However, both Sam Odom and Bobby Gifford testified *without objection* that appellant possessed a pistol. Even if the court erred in overruling appellant's objections to the testimony of Candy Gifford, "Where testimony is admitted erroneously over objection and the same testimony or testimony to the same effect is thereafter admitted without objection, the objection in the first instance is waived." *Kirvin v. State,* 575 S.W.2d 301, 302 (Tex.Crim.App.1978). Furthermore, appellant himself elicited much the same testimony from Odom on cross-examination.

Appellant also complains that the State was allowed to show through Donald Gifford's testimony not just that appellant carried a pistol, but that he carried a pistol into a premises licensed to serve alcoholic beverages. *See* TEX.PENAL CODE ANN. Sec. 46.02(c) (Vernon 1974). First of all, there is no evidence in the record that the bars appellant visited were licensed premises. Furthermore, the record shows that appellant objected to this testimony, but then elicited the same on cross-examination. A defendant may not complain of evidence elicited by his own attorney on cross-examination. *Ex parte Ewing,* 570 S.W.2d 941, 948 (Tex.Crim.App.1978); *see also Stephens v. State,* 522 S.W.2d 924, 927 (Tex.Crim.App.1975). Therefore, appellant waived any error.

Notwithstanding our conclusion that appellant waived any objection to this testimony, we hold that the testimony was admissible.

In *Williams v. State,* 662 S.W.2d 344 (Tex.Crim.App.1983), the Court wrote that the "true test" of extraneous offense evidence admissibility is whether the prosecution can show both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. *Williams* at p. 346.

In *Elkins v. State,* 647 S.W.2d 663 (Tex. Crim.App.1983), the Court wrote:

> In determining this evidentiary balance in a case established by direct evidence the court must consider whether the material issue to which the extraneous conduct is relevant is *contested,* and, if so, in looking to the attributes of the extraneous offense as shown by the State, determine whether its admission would be of *assistance to the jury* in resolving the contested issue before it.

647 S.W.2d at 665 (emphasis in original).

In the instant case, the issue of whether appellant was the gunman who shot Colonel Tyler was hotly contested, and the identification testimony of Mrs. Tyler was subjected to rigorous cross-examination. "In such a case where the State's only identifying witness is impeached as to a material detail of his identification, extraneous offenses are properly admissible to circumstantially prove identity. *Redd v. State,* 522 S.W.2d 890, 893 (Tex.Crim.App.1975).

We conclude that the testimony of witness Sam Odom showing appellant in possession of a firearm immediately prior to going to the Tyler residence would be of assistance to the jury in resolving the contested issue before it, and we further conclude that the probative value of the evidence outweighs its prejudicial effect. This evidence was also admissible on the theory that it showed the context in which the criminal act occurred. *Albrecht v. State,* 486 S.W.2d 97 (Tex.Crim.App.1972).

Appellant's third ground of error is overruled.

## SUPPLEMENTAL CHARGE

In his fourth ground of error, appellant alleges that the trial court erred in submit-

ting a supplemental charge to the jury in an untimely fashion.

After conclusion of the evidence, defense counsel submitted to the trial court a "special" requested charge on accomplice testimony. The requested charge was denied by the trial court. The trial court, however, did submit the following instruction to the jury on accomplice testimony:

7.

A conviction cannot be had upon the testimony of an accomplice witness unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

8.

The witness, Bobby Joe Gifford, is an accomplice witness, if an offense was committed, and you cannot convict the defendant upon his testimony unless you first believe that his testimony is true and shows that the defendant is guilty as charged, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside of the evidence of the said Bobby Joe Gifford tending to connect the defendant with the offense committed, if you find that an offense was committed. The corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

After the charge was read to the jury and after the jury had been engaged in deliberations for several hours, the trial court concluded that the *appellant's special requested charge* should have been granted. At this point the trial court prepared and gave the following supplemental charge to the jury:

I'm going to read to you the supplemental charge, further bearing in mind that Bobby Joe Gifford was an accomplice, if any offense was committed.

You are instructed you cannot find the Defendant, Fred T. Durrough, guilty of the offense charged against him upon Bobby Joe Gifford's testimony unless you first believe that said testimony is true and shows the Defendant is guilty as charged in the indictment.

Then you cannot convict of Capital Murder unless you further believe that there is other evidence in the case outside the testimony of Bobby Joe Gifford, tending to show first the commission of the alleged shooting occurred by the Defendant Fred T. Durrough.

Second that the Defendant shot Henry Tyler intentionally with the intent of thereby killing him.

Thirdly, the alleged shooting, if any, the Defendant was then and there in the course of committing or attempting to commit the felony offense of robbery of Henry Tyler or in the course of committing or attempting to commit the felony offense of burglary of a house of Henry Tyler; even then, before you can convict the Defendant of the offense alleged in the indictment you must believe from all the evidence beyond a reasonable doubt that the Defendant is guilty.

Appellant's counsel objected, *not to the charge, which was in conformance with the defense's original request, but rather that the supplemental charge was untimely.* Appellant makes the same complaint on appeal, arguing that the mandatory language of art. 36.16 provides that no further charge shall be given after counsel argues.

TEX.CODE CRIM.PROC.ANN. art. 36.16 (Vernon 1981), in part, provides:

After the argument begins no further charge shall be given to the jury unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony, and in the event of such further charge, the defendant or his counsel

shall have the right to present objections in the same manner as is prescribed in Article 36.15.

In *Bustillos v. State,* 464 S.W.2d 118, 125 (Tex.Crim.App.1971), it was held that the court may, before verdict, withdraw and correct its charge, if convinced an erroneous charge has been given. Appellant argues that *Bustillos* is distinguishable in that there, the defendant was able to argue the corrected charge to the jury.

Appellant argues that the action of the trial court was reversible error and cites *Nowlin v. State,* 76 Tex.Cr.R. 480, 175 S.W. 1070 (1915) as mandating a reversal. In *Nowlin,* a defendant was convicted of burglary of a boxcar. The trial court gave the jury a supplemental charge *after* both sides had rested. The case was reversed not because the supplemental charge was given, but because appellant's counsel was denied his valuable right to discuss the supplemental charge with the jury. The Court said:

> Before the act of April 5, 1913 (Acts 33d Leg c. 138), amending articles 735, 737, and 743, and adding article 737a to our Criminal Procedure, the statute required the judge to deliver his charge to the jury after all the argument was concluded. These articles now require the judge to deliver his charge before the argument; and, if article 737a is to be literally construed, the court has no right over appellant's objection to change his charge or give any additional charge, in any contingency after the argument has been concluded, except those mentioned in this article. But we believe that taking all of our statutes and previous decisions into consideration, and the purpose and object of the Legislature in making the changes by said act of 1913, said article 737a should not be construed to prohibit the court absolutely under all circumstances from changing or adding to his charge. For instance, if the court should become convinced that an erroneous charge against the accused had been given, he should not be precluded from withdrawing it and correcting the matter before the verdict. Otherwise, trials in some instances would be mere farces, for, when the jury returned a verdict of guilty under such an erroneous charge, the court would be under the necessity of at once setting the verdict aside and retrying the whole case. Taking this case as an illustration, we think it clear that the court's first charge on this subject was erroneous and against appellant. The court ought, in a proper way, to have corrected the matter.
>
> However, we conclude from the whole record that appellant in good faith desired to argue the question when the court changed his charge, and he was deprived of a valuable right, prejudicial to him by not being permitted to do so. The court could reasonably regulate the time allowed for such argument. He need not have given the appellant's attorneys a very long time, but he should have given them a reasonable time.

*Nowlin,* 175 S.W. at 1072.

Since the charge complained of was a *supplemental* charge, and the court's *original* charge contained an instruction that Bobby Joe Gifford was an accomplice and that his testimony must be corroborated, appellant did have an opportunity and in fact did argue this point to the jury. Furthermore, appellant did not request that the trial court give him more time to argue the supplemental charge. Generally trial courts shall not give supplemental charges to juries after they retire to deliberate. However, in light of the record as a whole in this case, no reversible error occurred. Appellant's fourth ground of error is overruled.

In his fifth ground of error, appellant complains that the evidence adduced at trial was insufficient to prove appellant's guilt beyond a reasonable doubt, inasmuch as the accomplice testimony was not corroborated.

Essential to appellant's fifth ground of error is a preliminary holding by this Court that the testimony of Mrs. Dorothy Tyler should not have been admitted. We have rejected this contention and held that both

her in-court and out-of-court identification testimony was admissible.

The testimony of Bobby Gifford was corroborated when Mrs. Tyler placed appellant on her front porch and identified him as the gunman. This testimony directly connected appellant with the offense committed. *See* TEX.CODE CRIM.PROC. ANN. art. 38.14 (Vernon 1979). Furthermore, the testimony of Mrs. Tyler, standing alone, was sufficient to support the conviction. Appellant's fifth ground of error is overruled. The judgment of the trial court is AFFIRMED.

NYE, C.J., concurs in the result.

NYE, Chief Justice, concurring.

I concur in the result.